**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Paul Kitaj, et al., | No. CV-22-00463-TUC-JCH |
| Plaintiffs, | **ORDER** |
| v. | |
| Tammy Van Handel, et al., | |
| Defendants. | |

In this case, Plaintiffs Paul and Valorie Kitaj sue Defendant employees of the Arizona Department of Child Safety ("DCS") alleging Constitutional violations arising under the First, Fifth, and Fourteenth Amendments. Doc. 13 ("FAC") at 11–15. Before the Court are two related motions: (1) Defendants' Motion to Dismiss (Doc. 25) ("Motion I"); and (2) Plaintiffs' Motion to Strike Defendants' Sealed Exhibits (Doc. 33) ("Motion II"). For the following reasons the Court will grant Motion I and deny Motion II.[1]

## I.    Background[2]

Plaintiffs' son, Matthew, and his partner, Amanda, lived with Plaintiffs in their home after discovering Amanda was pregnant. FAC ¶ 8. When Plaintiffs learned Amanda was an active drug user, they helped her enter a drug rehab program, "oversaw her medical

---

[1] Plaintiffs' request for oral argument is denied because it would not aid the Court's decision. Fed. R. Civ. P. 78(b).

[2] The Court draws this account from the FAC's allegations, which the Court accepts as true at this stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court omits various conclusory allegations here, *see id.*, but will discuss them in turn below. *See* § III.A(a)–(c).

care," and "secured other services for her." *Id.* After Amanda gave birth, Plaintiffs cared for Amanda and her baby son R.K., forming a "strong bond with [R.K.], and R.K. with them." *Id.*

On September 22, 2019, a DCS investigator visited Plaintiffs' home, interviewed Amanda and Matthew, "spoke with Paul Kitaj," FAC ¶ 9, and "approved the home and Plaintiffs as caregivers for R.K." *See* FAC ¶ 14.

On October 1, 2020, the Pima County Sheriff's Department ("PCSD") responded to Plaintiffs' call that Matthew was threatening suicide, ultimately arresting Matthew on misdemeanor assault charges. FAC at 10–11. Plaintiffs believe that at some subsequent point, someone called the DCS Hotline and "made some sort of report." FAC ¶ 13. Defendant Body assigned Defendants Van Handel and Rondeau[3] to investigate. FAC ¶ 14.

On October 5, Defendants Van Handel and Rondeau spoke with Plaintiffs at the door to their home "for approximately … forty minutes." *Id.* ¶ 16. Plaintiffs explained they were "in process of securing residential treatment for their son." *Id.* Van Handel demanded entry, citing PCSD's observation that the home was "cluttered" and concern for R.K.'s welfare. *Id.* Plaintiffs refused Van Handel entry, citing their constitutional right to privacy, but brought R.K. to the door. *Id.* Van Handel and Rondeau could see into the house and its condition, and could see that R.K. was healthy, happy, and a well-adjusted infant. *Id.* Van Handel became hostile and was apparently angry that Plaintiffs denied entry based on their constitutional rights, and threatened to return with a court order if Plaintiffs did not let her in. FAC ¶ 17.

Later that day, Van Handel got a court order authorizing R.K.'s removal by misrepresenting among other things that Van Handel had not been allowed to see R.K. and that Plaintiffs had been "aggressive." FAC ¶ 18. Van Handel then repeated these misrepresentations to the PCSD and returned to Plaintiffs' home with two deputies. FAC ¶ 20. Van Handel served a Temporary Custody Notice ("TCN") on Amanda and removed R.K. FAC ¶ 21. R.K. went to live with Amanda's grandmother. *See* FAC ¶ 28.

---

[3] Defendant Rondeau has since been dismissed by stipulation. Doc. 24.

Three days later, Body denied Plaintiffs' request seeking R.K.'s placement with them. FAC ¶ 22. Body cited "'concerns' with Plaintiffs 'impeding the investigation and not allowing access to [their] home.'" FAC ¶ 22. Plaintiffs believe Van Handel and Body commenced a dependency petition, but Plaintiffs were not named or invited to appear as parties in that action. FAC ¶ 23. At some point after this first removal, Plaintiff Valorie Kitaj appeared on a podcast and criticized DCS staff. FAC ¶ 27. At some point after Valorie's appearance, Defendants Hartwell, Van Handel, and Galvin[4] began to document falsely that Plaintiffs were mentally unstable and dangerous to R.K. FAC ¶ 28. Specifically, Hartwell began to pressure Amanda's grandmother to call the DCS Hotline and allege R.K.'s abuse and neglect. *Id.*[5]

On January 25, 2021, the dependency petition was dismissed. FAC ¶ 25. Plaintiffs agreed to let Amanda and R.K. return to live with them. *Id.*

On February 24, Amanda's grandmother "placed a call to the [DCS] Hotline as the Defendants had pressured." FAC ¶ 28. On the call, "the grandmother, who first indicated the mental instability of the [Plaintiffs], repudiated that statement to the Hotline call taker, and informed him she had no grounds to report abuse or neglect." FAC ¶ 29. The DCS Hotline agent directed Amanda's grandmother to call PCSD and request a welfare check, but "on hanging up, [Amanda's grandmother] decided not to place that call, and so informed Hartwell that she would not agree to the demand." *Id.*

The next day, Van Handel arrived at Plaintiffs' home with PCSD deputies. FAC ¶ 31. She informed Plaintiffs that she was there to remove R.K. FAC ¶ 32. When asked for a warrant, Van Handel and the deputies withdrew beyond Plaintiffs' hearing for about 20 minutes. *Id.* When they returned, Van Handel told Plaintiffs she had a court order for R.K.'s

---

[4] Defendant Galvin has since been dismissed by stipulation. Doc. 24.

[5] If Plaintiffs choose to amend, they may wish to clarify the following detail. The second sentence of FAC ¶ 28 states that "Hartwell … began pressuring the grandmother to call the AZDCS Hotline[.]" The third sentence states, "She falsely reported that the Kitaj's were mentally unstable and a danger to the child." The fourth sentence states, "The grandmother resisted these demands, but … placed a call to the Hotline as the Defendants had pressured." As written, the pronoun "she" in the third sentence mean could either Hartwell or "the grandmother."

- 3 -

removal. FAC ¶ 33. Plaintiffs believe the removal was justified by allegations of an unsafe home environment, yet when Van Handel and the deputies walked through all the rooms in the home, it was "obviously safe." FAC ¶¶ 33–34. Van Handel spoke with Amanda outside the home and left with R.K. *See* FAC ¶ 34.

At some point after R.K.'s second removal, DCS filed a second dependency petition naming Amanda as a party but not Plaintiffs. FAC ¶ 35. At the same time, all named Defendants "commenced the process … of substantiating charges of neglect against only Valorie [Kitaj]," falsely claiming "that [Valorie] violated Arizona law in allowing [R.K.] to reside in [Plaintiffs'] home which put R.K. at unreasonable risk of harm from injury or illness," all in "retaliation … against Plaintiffs because they had engaged in expression of concern regarding [DCS's] actions in the first and second seizure." FAC ¶¶ 36–37. Defendants "continued to document allegations that the Plaintiffs were mentally ill and unstable," and provided the documentation to "the [Assistant Attorney General] prosecuting the case, [who used it] to oppose the Plaintiffs' later-filed motion to intervene in the dependency case." FAC ¶ 38.

In May or July 2021, Defendants also "pursued the substantiation of the false charge of neglect," and DCS "thereafter listed [Valorie] on the 'central registry' of offenders." FAC ¶ 41.

In October 2022, Plaintiffs filed this lawsuit. Doc. 1.

## II.  Legal Standard

A pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 does not demand detailed factual allegations, but "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570); Fed. R. Civ. P. 12(b)(6). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The

plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citations and parentheticals omitted). In considering a motion to dismiss, a court must accept the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. *Id.* at 550.

## III.   Analysis

### A.   Motion to Dismiss

Plaintiffs assert six claims for relief: (Count I) familial association and due-process claims under the First and Fourteenth Amendments against all Defendants (FAC ¶¶ 42–45); (Count II) Fourteenth Amendment judicial deception claims against Defendants Van Handel and Body, as related to the first removal (FAC ¶¶ 46–49); (Count III) First Amendment retaliation claims against Defendants Van Handel and Body, as related to the first removal (FAC ¶¶ 50–53); (Count IV) familial association and due-process claims under the First and Fourteenth Amendments against Defendants Van Handel, Hartwell, and Galvin (FAC ¶¶ 54–57); (Count V) Fourteenth Amendment judicial deception claims against Defendants Van Handel, Hartwell, and Galvin, as related to the second removal (FAC ¶¶ 58–61); and (Count VI) First Amendment retaliation claims against Defendants Van Handel, Hartwell, and Galvin (FAC ¶¶ 62–65).

#### a.   Familial Association (Counts I and IV)

In Counts I and IV, Plaintiffs allege that Defendants violated their First and Fourteenth Amendment rights of familial association. FAC ¶¶ 42–45. Defendants assert that Plaintiffs have no cognizable right to familial association because they are not R.K.'s parents or custodians. Doc. 25 at 6–7, 10.

A parent's interest "in the care, custody, and control of their children—is perhaps

the oldest of the fundamental liberty interests recognized by [the] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion). The First, Fourth, and Fourteenth Amendments "guarantee that parents will not be separated from their children without due process of law except in emergencies." *Keates v. Koile*, 883 F.3d 1228, 1236 (9th Cir. 2018) (citation and internal quotation marks omitted). Parents' constitutionally protected liberty interest in their children requires more than a genetic link alone. *Mullins v. State of Or.*, 57 F.3d 789, 794 (9th Cir. 1995). Even so, a parent's interest in their children does not extend to noncustodial grandparents or de facto parents. *Miller v. California*, 355 F.3d 1172, 1175–76 (9th Cir. 2004); *see also Kelley v. San Diego Cnty. Health & Hum. Servs. Agency*, 2021 WL 5742673, at *1 (9th Cir. Dec. 2, 2021). A parent's liberty interest also does not extend to foster parents. *Backlund v. Barnhart*, 778 F.2d 1386, 1389 (9th Cir. 1985); *see also Brittain v. Hansen*, 451 F.3d 982, 995 (9th Cir. 2006).

Here, Plaintiffs allege no facts suggesting that they are R.K.'s parents, foster parents, de facto parents, or custodial grandparents.[6] They allege only that they formed a "strong bond" with R.K. in the one year or so following his birth, when they "cared for" R.K. and his mother Amanda were living with Plaintiffs. *See* FAC ¶ 8. Plaintiffs also ambiguously assert that Defendant Perez "approved the placement," FAC ¶ 9, and "approved the home and Plaintiffs as caregivers for R.K." FAC ¶ 14. If Plaintiffs are seeking to allege that R.K. was placed in their custody and not Amanda's, they must say so clearly. As written, the FAC does not allege that Plaintiffs had any custodial relationship to R.K.

Plaintiffs argue that the right to familial association extends to all who establish "an 'intimate association' with [a] child—regardless of biological connection[.]" Doc. 37 at 9–12. Plaintiffs first cite *Gausvik v. Perez*, 239 F. Supp. 2d 1067, 1096 (E.D. Wash. 2002), *rev'd on other grounds by Gausvik v. Perez*, 345 F.3d 813 (9th Cir. 2003). Doc. 37 at 9. In

---

[6] Defendants allege that Plaintiffs are not R.K.'s biological grandparents, either. *See* Doc. 25 at 2. Defendants' factual dispute is better suited to summary judgment. Defendants' exhibits are not "matters of public record and facts that are not subject to reasonable dispute," such that judicial notice would be appropriate at this stage. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (cautioning courts not to notice disputed facts). The Court will therefore deny Defendants' motion for judicial notice.

*Gausvik*, the court recognized a right to familial association between a child, Travis, and Gausvik, "the only father [Travis] knew for [his] whole life." *Gausvik*, 239 F. Supp. 2d at 1095. Travis lived with Gausvik all 14 years of his life, and Gausvik considered Travis his son, was always Travis's legal custodian and guardian, and handled all Travis's school, medical, and legal issues. *See id.* Here, by contrast, Plaintiffs allege only a "strong bond" with R.K. formed in the year or so R.K. and his mother lived with Plaintiffs.

Plaintiffs next cite *Smith v. Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 843–44 (1977). Doc. 37 at 9. In *Smith*, foster parents sought to assert a liberty interest in their foster children. *See* 431 U.S. at 842. After discussing various considerations, the Court wrote that although the foster parents' "claim … raises complex and novel questions[,] [i]t is unnecessary … to resolve those questions definitively in this case [because] narrower grounds exist to support our reversal." *Id.* at 847 (quotation omitted). Even if *Smith*'s discussion were not dicta, Plaintiffs do not allege "emotional ties [that developed] between [a] foster parent and foster child [that] have their origins in an arrangement in which the State has been a partner from the outset." *See id.* at 845.

Plaintiffs next cite *Wooley v. City of Baton Rouge*, 211 F.3d 913, 921 (5th Cir. 2000). Doc. 37 at 10. In *Wooley*, the plaintiff sought to assert constitutional rights with respect to a child for whom plaintiff was the primary care giver, who provided all care ordinarily provided by parents, and who was given custody (later nullified) by the child's natural mother. *Id.* at 922. The court "acknowledged the possibility that a relationship similar to a parent-child relationship might exist between an unrelated adult and child [given]" "the 'intimacy of daily association' and the resulting emotional attachments." *Id.* at 922 (citation omitted). But the court ultimately affirmed the district court's finding that the plaintiff "failed to allege the violation of a *clearly established* constitutional right." *Id.* at 923 (emphasis in original). Here, Plaintiffs do not allege similar facts, such as that R.K.'s mother Amanda sought to give them custody or that a permanent custodial relationship was otherwise "countenanced by the child's natural mother." *Id.* Amanda is not party to this suit and Plaintiffs allege only a "strong bond" with R.K. formed in the year or so when R.K. and his mother lived with them.

- 7 -

Plaintiffs next cite *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1058 (9th Cir. 2018). Doc. 37 at 10.  In *Wheeler*, the court held that plaintiff, adopted by other parents as an infant, could not assert a due process claim for loss of familial companionship from the police shooting death of his biological mother. *Id.* at 1049–50. The court reasoned that "biological parents must maintain consistent involvement in a child's life and participation in child-rearing activities for their relationship to be entitled to the Fourteenth Amendment protections at issue here." *Id.* at 1058. The court noted that plaintiff "does not allege [his biological mother] raised him, otherwise resumed responsibility for his upbringing [after he was adopted], or even maintained consistent contact with him during his childhood." *Id.* Here, Plaintiffs do not allege that they raised R.K., assumed responsibility for his upbringing, or have been otherwise involved with R.K. except for the year or so R.K. and his mother lived with Plaintiffs.

Plaintiffs next cite *Moore v. City of East Cleveland*, 431 U.S. 494, 503–506 (1977). Doc. 37 at 12. In *Moore*, the City of East Cleveland enforced a housing ordinance limiting occupancy to nuclear families against a grandmother who refused to expel her 10-year-old grandson, who lived with her and was raised by her since his mother's death when the grandson was less than a year old. *See* 431 U.S. at 495–98, 506–07. Here, Plaintiffs do not allege a relationship with R.K. beyond the "strong bond" that formed in the year or so R.K. and his mother lived with Plaintiffs.

In conclusion, a review of Plaintiffs' cases finds little support for the sweeping claim that constitutional rights attach to any "'intimate association' with [a] child—regardless of biological connection." At best, Plaintiffs' cases show that a biological connection alone is not enough. *See generally Mullins*, 57 F.3d at 794 (making this point). But a right to familial association requires a substantially more long-standing and enduring relationship than Plaintiffs allege from the year or so R.K. and Amanda lived with them. *Cf., e.g.*, *id.* at 793 ("This nation's democratic tradition … demands our reluctance to expand the substantive protection of the Due Process Clause[.]"). Plaintiffs cite no cases to the contrary.

Plaintiffs' efforts to distinguish several of Defendants' cases are unavailing. *See* Doc.

37 at 11–12 (citing *Miller*, 355 F.3d at 1172; *Mullins*, 57 F.3d at 789; *Griggs v. Arizona*, 2013 WL 1498947 (D. Ariz. April 10, 2013)). In *Miller*, noncustodial grandparents sought to assert a constitutional right to family integrity "because they had assumed the role of parents … by providing for [their grandchildren's] care, comfort, and protection as well as their physical and psychological needs for a substantial period of time." 355 F.3d at 1175. The Court denied the grandparents' request because "the grand children were … wards of the court at all relevant times [and the grandparents'] interests … conflicted with the [grandchildrens]' mother and maternal grandmother, both of whom were also seeking to have the girls live with them instead[.]" *Id.* at 1176. Plaintiffs first argue that *Miller* is restricted to its facts. *Id.* But Plaintiffs do not allege substantially different facts; they do not, for example, allege any facts about the interests of R.K.'s mother and maternal grandmother (or maternal great-grandmother, for that matter). And much of *Miller*'s reasoning applies squarely here. *See, e.g.*, 355 F.3d at 1175.

Plaintiffs similarly argue that their connection to R.K. is more substantial than the prospective adoptive grandparents with merely a "biological connection … standing alone" in *Mullins* and *Griggs*. Doc. 37 at 11. Plaintiffs do allege more than their interest in adopting R.K. and a biological connection to him, but not much more. Substantially more is required. *Cf., e.g.*, *Murphy v. Hayes*, 2023 WL 4488995 at *2 (D. Ariz. July 12, 2023) (liberty interest found for "functionally [a] step-father" who was married to the children's mother, was their only family, provided parental care, discipline-related decisions, financial support, health insurance, and where each child had an emotional connection with him); *Sanchez v. Cnty. of Santa Clara*, 2018 WL 3956427 at *9 (N.D. Cal. Aug. 18, 2018) (liberty interest found for paternal grandmother and paternal step-grandfather who were given custody of two children by the biological parents, who lived with the children 3–4 years without the biological parents present, and who served as surrogate parents to them); *Ramirez v. City of Oxnard*, 2013 WL 12129396, at *7 (C.D. Cal. July 23, 2013) (liberty interest found for step-mother who married Decedent child's biological father and raised Decedent as her son for almost 14 years); *see also Osborne v. Cnty. of Riverside*, 385 F. Supp. 2d 1048, 1053–55 (C.D. Cal. 2005) (liberty interest not found for grandmother and

aunt who failed to allege "a long-standing custodial relationship"). Without more, Plaintiffs fail to state a claim for violation of a protected liberty interest, and the Court will dismiss without prejudice Counts I and IV accordingly.

### b.  Judicial Deception (Counts II and V)

The Court will dismiss without prejudice Counts II and V for similar reasons. Count II concerns R.K.'s first removal, and Count V concerns R.K.'s second removal. *See* FAC at 11, 13. In Count II, Plaintiffs claim that Defendants Van Handel and Body secured a court removal order that contained "material misrepresentations and omitted exculpatory evidence." FAC ¶ 18. The FAC alleges that the misrepresentations relate to both Plaintiffs' refusal to allow Defendants to see R.K. and Mrs. Kitaj's alleged aggression with Van Handel. *Id.* They further claim that but for the misrepresentations, the court would not have authorized the removal. *Id.*  In Count V, Plaintiffs allege that the court would not have authorized the second removal of R.K. but for Defendants' false and fabricated allegations. Plaintiffs allege Defendants Hartwell, Van Handel, and Galvin falsely documented that the Plaintiffs were mentally unstable. FAC ¶ 28. When they were unable to commence another proceeding to removal the child, the Defendants "fabricated reasons to seize the child a second time." *Id.* ¶ 29. Both judicial deception claims fail to establish a liberty interest and fail to make more than conclusory allegations.

The Fourteenth Amendment prohibits state officials from deliberately fabricating evidence. *Spencer v. Peters*, 857 F.3d 789, 793 (9th Cir. 2017). To establish a judicial deception claim, a plaintiff must show "(1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty." *Id.* at 798. To succeed on the second element, a plaintiff must show that "(a) the act was the cause in fact of the deprivation of liberty, meaning that the injury would not have occurred in the absence of the conduct; and (b) the act was the "proximate cause" or "legal cause" of the injury, meaning that the injury is of a type that a reasonable person would see as a likely result of the conduct in question." *Id.* (citation omitted). A plaintiff must also "state with particularity the circumstances constituting [the] fraud." Fed. R. Civ. P. 9(b). That is, plaintiffs must allege "the who, what, when, where, and how of the misconduct charged."

*Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010). This includes what is false or misleading about a statement and why it is false. *Id.* Conclusory allegations of fraud are insufficient. *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016) (citation omitted).

As to Count II, Plaintiffs do not sufficiently show that the misrepresentations caused the alleged deprivation. Simply stating that Defendants' misrepresentations were the sole reason the court authorized the removal is conclusory. Plaintiffs allege no facts showing that the misrepresentations were material to the removal. Specifically, Plaintiffs do not allege what the juvenile court did and did not consider in making its decision. Because the Court will dismiss Count II without prejudice, the Court also notes some minor tensions in Plaintiffs' allegations. Plaintiffs allege Defendants misrepresented that "Plaintiffs had refused to allow Defendants to see R.K., and that [Valorie] had been 'aggressive.'" FAC ¶ 18. Plaintiffs later allege Defendants falsely told PCSD that "Plaintiffs would not let [Van Handel] see [R.K.], that Plaintiffs were 'not cooperating,' and that [Valorie] was being aggressive,' all consistent with the misrepresentations in the application[.]" FAC ¶ 20. Plaintiffs later allege that Defendant Body denied Plaintiffs' request for placement while "repeat[ing] misrepresentations concerning Plaintiffs[, including] … 'impeding the investigation and not allowing access to [Plaintiffs'] home.'" FAC ¶ 22. But Plaintiffs also allege that they "declined to allow Defendants into the home," and that Valorie "informed Defendants that she did not know them, and that the family had a constitutional right to privacy." FAC ¶ 16. Plaintiffs thus do not plausibly allege that Defendants misrepresented that they were denied entry. Instead, Plaintiffs allege Defendants misrepresented that they were not allowed to see R.K., mischaracterized Plaintiffs refusal to let them in as "not cooperating," and mischaracterized the manner in which Valorie "raised her concern about constitutional privacy rights," FAC ¶ 17, as "aggressive." If Plaintiffs choose to amend, they may wish to clarify these aspects of Count II.

As to Count V, Plaintiffs do not provide Defendants with a "fair notice" of the claims against them. Plaintiffs list three defendants—Van Handel, Hartwell and Galvin—as the actors in the second judicial deception claim. FAC at 13:10–12. But Plaintiffs subsequently

also allege the second claim against "these two Defendants." *Id.* at 13:14–15. These ambiguous statements prevent Defendants from determining which two of three is implicated or the specific conduct attributed to each actor. Count V also recites the elements of deception without supplying detail. It states that "the allegations supporting the application were false and fabricated," that "actions taken by Defendants … were done intentionally [and] … without probable cause," and R.K.'s removal "was accomplished by judicial deception." FAC ¶ 60. That "will not do." *Twombly*, 550 U.S. at 555.

For both Counts II and V, even if Plaintiffs did plausibly allege that the Defendants' deception caused R.K.'s removal, the claim would fail because, as the Court has already determined, Plaintiffs fail to allege a deprivation of liberty. Plaintiffs allege Defendants removed R.K. from his mother, not from the Plaintiffs. For these reasons, Plaintiffs fail to state a claim under Counts II and V, and the Court will dismiss them without prejudice.

### c. First Amendment Retaliation (Counts III and VI)

In Count III, Plaintiffs allege Defendants removed R.K. the first time "because Plaintiffs objected on constitutional grounds" to the Defendant entering their home. FAC ¶ 52. In Count VI, Plaintiffs allege Defendants removed R.K. the second time "because Plaintiffs had objected on constitutional grounds" to Defendants entering their home and also because Plaintiffs "criticized the actions of [DCS]" on a podcast. *See* FAC ¶ 64.

To establish a First Amendment retaliation claim, plaintiffs must show: (1) that they were engaged in constitutionally protected activity; (2) that the defendants' actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct. *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016). After the plaintiffs meet these elements, the burden shifts to the state defendants to show that they "would have taken the same action even in the absence of the protected conduct." *Id.*

Count III is deficient because Plaintiffs' complaint does not contain sufficient facts to suggest R.K.'s first removal was in any way motivated by Plaintiffs' refusal to allow the Defendant's into their home. Plaintiffs allege Van Handel "became hostile" and "appeared angry" because she was denied entry into the Plaintiffs' home. FAC ¶ 17. Plaintiffs also

- 12 -

*conclude* that absent Defendants "misrepresentations and without the omitted exculpatory facts, no [court order] could have issued[] because there was no probable cause that R.K. had been abused, neglected," or was in danger of either. FAC ¶ 18. But Plaintiffs allege no facts connecting Van Handel's hostility with Plaintiffs' legal conclusion that no court order could issue absent misrepresentations. Plaintiffs ambiguously allege "Defendants, further, falsified department records in order to continue the separation of Plaintiffs from R.K." FAC ¶ 52. To the extent Plaintiffs are referring to their allegation that Defendant Body denied Plaintiffs' placement request, FAC ¶ 22, Plaintiffs fail to show that Body's decision was motivated by more than "'concerns' with Plaintiffs' 'impeding the investigation and not allowing access to [Plaintiffs'] home," and "not being 'aligned' with [DCS]." *Id.*

Plaintiffs' Count VI retaliation claim is similarly deficient to the extent it relies on conclusory allegations that Plaintiffs' assertion of their constitutional rights substantially motivated Defendants' behavior. Count VI is also deficient to the extent it alleges Defendants removed R.K. the second time in retaliation for Valorie's criticism of DCS on a podcast. Plaintiffs allege the podcast episode "came to the notice of the Defendants" and "constituted additional motivation for them to act against the Plaintiffs." FAC ¶ 27. But Plaintiffs allege no facts creating a nexus between the disparaging comments on the podcast and the removal of R.K. Missing from the FAC are any allegations substantiating when the podcast was made, what statements Defendants found disparaging, when the podcast came to the attention of the Defendants, or even how or if the Defendants were aware of the podcast. Plaintiffs instead conclude the podcast was additional motivation for R.K.'s second removal without providing any facts connecting the two events.

### d.  Qualified Immunity

Defendants assert qualified immunity from Plaintiffs claims. Doc. 25 at 13. Qualified immunity attaches unless a constitutional right (1) was violated and (2) was "clearly established" at the time. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). A legal principle is "clearly established" when it derives from "settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority[.]" *D.C. v. Wesby*, 583 U.S. 48, 63 (2018) (citation and internal quotation marks omitted). The

- 13 -

Court has discretion to analyze either step first, *see Pearson*, 555 U.S. at 236, and is advised to "think hard, then think hard again" before analyzing both. *Wesby*, 583 U.S. at 62 n. 7 (citation omitted). Qualified immunity balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. An official performs their duties reasonably by avoiding "acts that have been clearly established as unconstitutional … as well as other, similar acts[.]" 724 F.3d at 1168 (citation omitted). These similar acts "must be sufficiently similar to place an action's lawfulness 'beyond debate.'" *See Wesby*, 583 U.S. at 63 (citation omitted). The "'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that 'insubstantial claims' against government officials [will] be resolved prior to discovery.'" *Pearson*, 555 U.S. at 231 (citing *Anderson v. Creighton*, 483 U.S. 635, 640, n. 2 (1987)).

      The Court does not reach Defendants' qualified immunity argument because it will dismiss the FAC without prejudice on the merits. But the Court notes a concern that may guide Plaintiffs' amendment. Even if Plaintiffs managed to amend their complaint to fix the deficiencies outlined above, the Court does not see how they could defeat the second prong of qualified immunity. Plaintiffs must present clearly established law from similar, controlling precedent that removes the issue of their liberty interest beyond debate. That is a very high bar. Plaintiffs cannot clear it with, for example, the cases they cite in their FAC. *See, e.g.*, *Miller*, 355 F.3d at 1175 ("While there is no question that parents have a constitutionally protected liberty interest in making decisions about the care, custody, and control of their children, … we have never held that any such right extends to *grandparents*.") (emphasis in original) (citations omitted). The Court's review of Plaintiffs cases revealed that they stand only for the proposition that a genetic link alone is not enough to create a right to familial association. But those same cases appear not to clearly establish what *is* required. And accepting Plaintiffs' allegations as true, this is not the sort of case that is so obvious that similar precedent is not required. *See* Doc. 37 at 15 (citing *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082 (10th Cir. 2015)).

      Plaintiffs' argument that qualified immunity is best left for a developed factual

record is also not persuasive in this context. The Court recognizes that "determining claims of qualified immunity at the motion-to-dismiss stage raises special problems for legal decision making." *Keates*, 883 F.3d at 1234. But these "special problems" have primarily to do with the first prong of the Court's analysis. The first prong is a fact-specific inquiry best left for a developed record. *Cf. O'Brien*, 818 F.3d at 936. But lower courts are free to consider either prong first precisely because "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Pearson*, 555 U.S. at 237. This appears to be such a case.

The fact that Plaintiffs' qualified immunity section does not cite *any* cases involving similar facts reinforces the Court's impression. *See* Doc. 37 at 12–16. So does Plaintiffs' dedication of nearly half that section to the argument that "[t]he doctrine of qualified immunity is foreclosed by the original text of the Civil Rights Act of 1871." Doc. 37 at 13– 14. As Plaintiffs anticipate, *id.* at 14, the Court rejects their conclusion that every qualified immunity case has been wrongly decided. A district court has no business bucking the analysis of every higher court to date. Instead, the Court will assume Plaintiffs' allegations are true and look for clearly established law notifying all reasonable officials that acting as Plaintiffs allege is unlawful. If Plaintiffs fail so completely to provide that law again, the Court will consider dismissing with prejudice.

### B.  Motion to Strike

Plaintiffs move to strike Defendants' exhibits A and B, alleged to be R.K.'s Birth Certificate and a paternity test proving R.K. is not the biological grandson of the Plaintiffs. Doc. 33. Defendants oppose Plaintiffs' motion. Doc. 37.

Plaintiffs' motion is mooted by the Court's disposition here. Plaintiffs' claims fail under the facts as alleged. The Court has denied Defendants' motion for judicial notice, taken Plaintiffs' allegations as true, including that they are R.K.'s biological grandparents, and will dismiss without prejudice all the same. Plaintiffs are advised that if future discovery reveals this case was brought frivolously and without a good faith basis, they risk heavy sanctions.

///

**IV.**     **Order**

Accordingly,

**IT IS ORDERED GRANTING IN PART** Defendants' Motion to Dismiss (Doc. 25).

**IT IS FURTHER ORDERED DENYING IN PART** Defendants' Motion to Dismiss (Doc. 25) to the extent it seeks judicial notice of its attached exhibits.

**IT IS FURTHER ORDERED DISMISSING WITHOUT PREJUDICE** Plaintiff's First Amended Complaint (Doc. 13). Plaintiff may file a Second Amended Complaint within thirty (30) days from the date of this Order.

**IT IS FURTHER ORDERED DENYING AS MOOT** Plaintiffs' Motion to Strike (Doc. 33).

Dated this 11th day of September, 2023.

John C. Hinderaker
United States District Judge