**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Paul Kitaj, et al., | No. CV-22-00463-TUC-JCH |
| Plaintiffs, | **ORDER** |
| v. | |
| Tammy Van Handel, et al., | |
| Defendants. | |

In this case, Plaintiffs Paul and Valorie Kitaj brought suit against Defendant employees[1] of the Arizona Department of Child Safety ("DCS") alleging constitutional violations arising under the First and Fourteenth Amendments. Doc. 47 ("SAC") at 3–20. Before the Court is Defendants' Motion to Dismiss Second Amended Complaint. Doc. 59. On June 6, 2024, the Court heard oral argument (Doc. 72), and the matter is fully briefed (*see* Docs. 66 and 67). For the following reasons the Court will grant in part and deny in part Defendants' Motion.

///
///
///
///
///

---

[1] Defendant Galvin has been dismissed by stipulation. Doc. 24. The Court recognizes and accepts Plaintiffs' stipulation that Galvin was included in the Second Amended Complaint in error. Doc. 66 at 1 n.1.

**I.      Background**[2]

Plaintiffs' son, Matthew, and his partner, Amanda, lived with Plaintiffs in their home after discovering Amanda was pregnant. SAC ¶¶ 9–11. When Plaintiffs learned Amanda was an active drug user, they helped her enter a drug rehab program, oversaw her medical care, and provided financial and emotional support to her. SAC ¶¶ 12–13.

After Amanda gave birth, Plaintiffs cared for Amanda and her baby son, R.K., believing R.K. was their biological grandchild. SAC ¶¶ 17, 34. Plaintiffs cared for R.K. "constantly"; provided emotional, physical, and psychological support; and were the sole source of financial support. SAC ¶¶ 16–18. Plaintiffs developed a "strong bond of love and protection" with R.K. SAC ¶¶ 17–18. Additionally, Plaintiff Valorie Kitaj visited the newborn R.K. in the pediatric intensive care unit "as constantly as hospital policy allowed," and, once he was home, "took on the preponderance" of responsibilities related to childcare, education, entertainment, and decisions regarding discipline for R.K. SAC ¶¶ 15–18. This relationship existed for the entire first year of R.K.'s life. SAC ¶ 18.

On September 22, 2019, a DCS investigator visited Plaintiffs' home, interviewed Amanda and Matthew, "spoke with Paul Kitaj," SAC ¶ 19, and "approved the placement." SAC ¶ 19.

On October 1, 2020, the Pima County Sheriff's Department ("PCSD") responded to Plaintiffs' call that Matthew was threatening suicide, and ultimately arrested Matthew on misdemeanor assault charges. SAC ¶¶ 20–21. Amanda had several very small marks on her neck but denied Matthew tried to choke her or that she lost consciousness. SAC ¶ 21. At some point, someone called the DCS Hotline and "made a report." SAC ¶ 23. Defendant Body assigned Defendant Van Handel to investigate. SAC ¶ 24.

---

[2] The Court draws this account from the SAC's allegations, which the Court accepts as true at this stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court declines to take judicial notice of the "extraneous material" provided by Defendants in the Motion to Dismiss because these materials are (1) not central to Plaintiffs' claims and (2) not necessary to clarify any allegations in the SAC. *See* Doc. 59 at 6 (citing *Ranch Realty, Inc. v. DC Ranch Realty, LLC*, 614 F.Supp. 2d 983, 987–88 (D. Ariz. 2007)).

On October 5, Defendant Van Handel spoke with Plaintiffs at the door to their home for approximately forty minutes. SAC ¶ 26. Plaintiffs explained they were "in process of securing residential treatment for their son." *Id.* Van Handel demanded entry, citing concern for R.K.'s welfare and PCSD's observation that the home was "cluttered." *Id.* Plaintiffs refused Van Handel entry, citing their constitutional right to privacy and concerns about COVID, but brought R.K. to the door. *Id.* Van Handel could see into the house and its condition, and it was "obvious" that R.K. was "healthy, happy, and a well-adjusted infant." *Id.* Van Handel became hostile and appeared angry that Plaintiffs denied entry based on their constitutional rights. SAC ¶ 27. Van Handel stated she was going to come back, and that Plaintiffs would have to let her in at that point. SAC ¶ 27.

Later that day, Van Handel obtained a court order authorizing R.K.'s removal by misrepresenting among other things that Van Handel had not been allowed to see R.K. and that Plaintiffs had been "aggressive." SAC ¶ 29. Van Handel omitted exculpatory facts, including that Van Handel observed the child, the child appeared healthy and happy, and there was no evidence the child was in danger. SAC ¶ 29. Van Handel repeated the misrepresentations to PCSD and returned to Plaintiffs' home with two deputies. SAC ¶ 32. Van Handel served a Temporary Custody Notice ("TCN") on Amanda and removed R.K. SAC ¶ 33.

Three days later, Body denied Plaintiffs' request to place R.K. with them. SAC ¶ 34. Body cited "'concerns' with Plaintiffs 'impeding the investigation and not allowing access to [their] home.'" SAC ¶ 34. Plaintiffs believe Van Handel and Body commenced a dependency petition, but Plaintiffs were not named or invited to appear as parties in that action. SAC ¶ 35. Van Handel and Body submitted materials to the Assistant Arizona Attorney General ("AZAG") that contained material misrepresentations and omissions, which the AZAG relied on to prepare the dependency petition. SAC ¶ 36.

Defendants placed R.K. with JoAnne Hall, Amanda's maternal grandmother, and allowed Amanda to reside with R.K. in Hall's home. SAC ¶ 52. On November 8, 2020, Plaintiffs made a formal complaint to the DCS Ombudsman for R.K.'s removal and

continued separation from Plaintiffs. SAC ¶ 53. Defendants were notified of the complaint and rejected Plaintiffs' concerns. SAC ¶ 53.

On November 20, 2020, Plaintiff Valorie Kitaj appeared on a podcast and criticized DCS staff. SAC ¶ 54. Sometime after Valorie's appearance, Hartwell undertook social media searches related to Plaintiffs. SAC ¶ 60. Between November 20 and December 4, 2020, Hartwell downloaded a copy of the podcast and two unrelated news reports from 2018 and 2020 that featured Plaintiff Valorie Kitaj. SAC ¶ 61. Defendants Hartwell and Van Handel began to document falsely that Plaintiffs were mentally unstable, and Valorie was a danger to R.K. FAC ¶ 58. On December 4, 2020, Hartwell emailed the podcast and news reports to Amanda and Mrs. Hall. SAC ¶ 62. Hartwell continued to periodically report to Mrs. Hall that Plaintiffs were mentally unstable, warning Mrs. Hall to "be very careful about letting [Plaintiffs] see [R.K.] … because you don't know what they are capable of…." SAC ¶ 63, 67.

On January 8, 2021, the dependency petition was dismissed. SAC ¶ 64. Shortly thereafter, Amanda and R.K. returned to live with Plaintiffs and "[t]he family immediately returned to the close association that had existed before the first removal." SAC ¶¶ 65–71.

On February 24, Mrs. Hall "placed a call to the [DCS] Hotline [because] the Defendants had pressured her." SAC ¶ 72. On the call, Mrs. Hall, "who first indicated the mental instability of the [Plaintiffs], repudiated that statement to the Hotline call taker, and informed him she had no grounds to report abuse or neglect." SAC ¶ 73. The DCS Hotline agent directed Mrs. Hall to call PCSD and request a welfare check, but "on hanging up, [Hall] decided not to place that call, and so informed Hartwell that she would not agree to the demand." SAC ¶ 73.

The next day, Van Handel arrived at Plaintiffs' home with three PCSD deputies. SAC ¶ 75. She informed Plaintiffs that she was there to remove R.K. SAC ¶ 76. When asked for a warrant, Van Handel and the deputies withdrew beyond Plaintiffs' hearing for about 20 minutes. SAC ¶ 76. When they returned, Van Handel told Plaintiffs she had a court order for R.K.'s removal. SAC ¶ 77. Defendants stated the removal was justified by

allegations of an unsafe home environment and because a "'restraining order' had issued against Plaintiffs' having any contact with the mother and child." SAC ¶ 77. Defendants alleged in the second Court Authorized Removal Order ("CAR"):

> Valorie Kitaj neglected [R.K.], age 1, when she failed to provide shelter as she allowed the child to reside in a home containing spoiled food, cleaning products, piles of clothing and other items within reach of the child, placing the child as [sic] unreasonable risk of harm for injury and illness.

SAC ¶ 78. But when Van Handel and the deputies walked through all the rooms in the home, it was "obviously safe." SAC ¶ 79.

Despite knowing the conditions in the CAR did not exist and that there was no restraining order issued, Van Handel removed R.K. SAC ¶ 79. R.K. was placed in foster care and Defendants barred Plaintiffs from any contact. SAC ¶ 79. Plaintiffs allege Defendants' refusal to allow visitation was motivated by retaliatory intent. SAC ¶ 86. Plaintiffs moved to intervene in the second dependency proceedings and sought R.K.'s placement with them. SAC ¶ 38. The juvenile court granted Plaintiffs' motion to intervene, finding "the intervenors' interest is one of grandparents. Although they are not biologically related to the child, they have established that type of relationship by the minor living in their home and their belief that their son was his father." SAC ¶ 39.

Defendants then "commenced the process … of substantiating charges of neglect against only Valorie Kitaj," claiming Valorie violated Arizona law in committing neglect against R.K. SAC ¶¶ 88–89. Defendants knew that a finding of substantiation would place Mrs. Kitaj on the Central Registry, "and that, as a nurse, she would subsequently, for life, be denied employment by any agency or health care provider" that is required to consult the Central Registry before hiring. SAC ¶ 90. On July 13, 2021, Mrs. Kitaj received a letter stating that her name was placed on the Central Registry. SAC ¶ 92. Plaintiffs allege this action was done in retaliation and as punishment because Plaintiffs engaged in protected expressions regarding the department's actions in the first and second seizures. SAC ¶¶ 93–94.

In October 2022, Plaintiffs filed this lawsuit. Doc. 1. In February 2023, Plaintiff filed a First Amended Complaint (Doc. 13), which the Court dismissed in September 2023

(Doc. 44). On October 23, 2023, Plaintiff filed a Second Amended Complaint (Doc. 47), which Defendants seek to dismiss (Doc. 59).

## II.     Legal Standard

A pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 does not demand detailed factual allegations, but "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570); Fed. R. Civ. P. 12(b)(6). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citations and parentheticals omitted). In considering a motion to dismiss, a court must accept the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. *Id.* at 550.

## III.    Analysis

Plaintiffs assert four claims for relief: (I) "First and Fourteenth Amendment Violation: Familial Association: Judicial Deception" against Defendants Van Handel and Body, related to the first removal (SAC ¶¶ 7–40); (II) First Amendment retaliation against Defendants Van Handel and Body, related to the first removal (SAC ¶¶ 41–48); (III) judicial deception under the Fourteenth Amendment, against Defendants Van Handel,

Hartwell, and Galvin, related to the second removal (SAC ¶¶ 49–80); and (IV) First Amendment retaliation claims against Defendants Van Handel, Hartwell, and Galvin, related to the second removal and placement on the Department Central Registry (SAC ¶¶ 81–95).

Defendants move to dismiss Plaintiffs' claims because, Defendants allege, (1) Plaintiffs lack standing; (2) Defendants are entitled to qualified immunity; and (3) Plaintiffs' Claim IV is beyond the scope of amendment, time barred, and implausibly alleged. Doc. 59 at 1.

**A. Plaintiffs' Standing: Right to Familial Association (Claims I and III)**

Claims I and III are premised on Plaintiffs having a right to familial association with R.K. under the Fourteenth Amendment. Defendants allege Plaintiffs lack standing because Plaintiffs cannot establish "a legally protected interest to a familial relationship as non-relatives to their adult son's ex-girlfriend's son." Doc. 59 at 8. Defendants cite *Mullins v. Oregon*, which states "whatever claim a prospective adoptive parent may have to a child, we are certain that it does not rise to the level of a fundamental liberty interest." 57 F.3d 789, 794 (9th Cir. 1995). Defendants also rely on *Miller v. California*, 355 F.3d 1172, 1175–77 (9th Cir. 2004), for the proposition that noncustodial grandparents who act as "de facto" parents under state law, have "no protected liberty interest in their relationship with their biological grandchildren" and that "a parent's fundamental liberty interest in their children does not extend to noncustodial grandparents or de facto parents." Doc. 59 at 11.

While "[t]he government generally is under no obligation to facilitate or fund the exercise of constitutional rights," there is "a negative right to freedom from governmental interference" in the family unit that is distinct from the affirmative right to receive state support in creating a family unit. *Lipscomb v. Simmons*, 962 F.2d 1374, 1378–79 (9th Cir. 1992). In other words, the negative right to preserve an "extant family unit" is distinct from the affirmative right to create "a new family unit where none existed before." *Mullins*, 57 F.3d at 793–94. Defendants almost exclusively rely on caselaw related to the latter, while the issues here involve the former.

For example, Defendants cite *Mullins*, where plaintiff grandparents brought a claim against the state for an *affirmative* right to familial association after they had been denied the opportunity to adopt their biological grandchildren. 57 F.3d at 791–92. But *Mullins* specifies that "[a] negative right to be free of governmental interference in an already existing familial relationship does not translate into an affirmative right to create an entirely new family unit out of whole cloth." *Id.* at 794.

*Miller* similarly involves paternal grandparents seeking visitation with their biological grandchildren by alleging the *affirmative* right to familial association. 355 F.3d at 1173–75. The court found no right to familial association because "there was no existing family unit of which" the state "sought to break asunder." *Id.* at 1176. Instead, the grandchildren were wards of the court at all relevant times, including when the state appointed the grandparents as "de facto" parents. *Id.*

The "Constitution protects the sanctity of the family," in whatever form that family may appear: "[t]he tradition of uncles, aunts, cousins, and especially grandparents sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition." *Moore v. City of E. Cleveland*, 431 U.S. 494, 503 (1977). While biology alone does not a family unit make, *see e.g.*, *Miller*, 355 F.3d at 1176, neither is biology a prerequisite, *Smith v. Org. of Foster Fams. For Equal. & Reform* ("*OFFER*"), 431 U.S. 816, 843 (1977) ("biological relationships are not the exclusive determination of the existence of a family"). Nor does the right to familial association "extend to those who assert no interest other than the gratification, convenience, and economy of sharing the same residence," such as with roommates or boarders. *Moore*, 431 U.S. at 536. Indeed, "context matters greatly when determining whether a non-biological parent–child relationship is deserving of constitutional protection." *Ramirez v. City of Oxnard*, 2013 WL 12129396, *7 (C.D. Cal. July 23, 2013).

Courts consider many factors when evaluating whether a relationship qualifies as a constitutionally protected family unit. Such factors might include: emotional attachment from "the intimacy of daily association," *OFFER*, 431 U.S. at 844; an "expectation of

enduring companionship," *Gausvik v. Perez*, 239 F. Supp. 2d 1067, 1096 (E.D. Wash. 2002), *rev'd other grounds*, 345 F.3d 813 (9th Cir. 2003); the provision of care, discipline, and financial support, *Murphy v. Hayes*, 681 F. Supp. 3d 1043, 1047 (D. Ariz. 2023); "a deeply interdependent and lengthy relationship," *Ramirez*, 2013 WL 12129396 at *7; and a relationship that predates any government intervention—that is, it did not arise as a "creature of state law," *Ramirez*, 2013 WL 12129396 at *7 (citing *OFFER*, 431 U.S. at 845). Relying on these principles, other courts within this circuit have recognized, for example, a stepparent's or step-grandparent's standing to assert a claim for loss of familial association. *Murphy*, 681 F. Supp. 3d at 1047–48 (collecting cases). That said, there typically exists either a biological *or* legal (e.g., marriage, adoption) connection with the child, in addition to the factors assessing quality.

Here, taking Plaintiffs' allegations as true and construing them in the light most favorable to Plaintiffs, Plaintiffs' relationship with R.K. does not rise to the level of a family unit, entitled to protection under the Fourteenth Amendment.

Certainly, Plaintiffs developed an emotional attachment to R.K. from their daily associations. And Plaintiffs demonstrated an expectation of enduring companionship: they cared for R.K. in utero, SAC ¶¶ 12–13, and throughout the first year of his life, SAC ¶ 18, and then returned to the same living arrangement as soon as permitted after dismissal of the first removal proceedings, SAC ¶¶ 68–71. Additionally, the relationship predated any government intervention.

A much closer call is whether Plaintiffs had a "deeply interdependent and lengthy relationship" with R.K. Plaintiffs undoubtedly gave care, devotion, and affection to R.K., and R.K. would have clearly benefitted from such. But R.K.'s relationship was of a dependent—not *inter*dependent—nature. R.K. could not reciprocate in any more than an infantile way. And the fact remains that R.K. will have no memory of his time spent with Plaintiffs. While it may seem crass to reduce a caregiver relationship in this manner, the details matter. Additionally, the one-year relationship here hardly compares with the familial association cases from other courts assessing relationships of 20 years, *Garcia v.*

*Cnty. of Napa*, 2022 WL 110650, *3–4 (N.D. Cal. Jan. 12, 2022), *aff'd on other grounds sub nom. Garcia through AG v. Cnty. of Napa*, 2024 WL 1734125 (9th Cir. Apr. 23, 2024); 14 years, *Ramirez*, 2013 WL 12129396 at *7; or even 4 and 3 years, *Sanchez v. Cnty. of Santa Clara*, 2018 WL 3956427, *1, *7 (N.D. Cal. Aug. 17, 2018). The courts have never imposed a minimum amount of time necessary to find a liberty interest in familial association. But a one-year relationship with an infant is not of like quality with the lengthy relationships of the cases above.

Plaintiffs lack standing to bring Claims I and III because they do not have a cognizable liberty interest in their relationship with R.K. Accordingly, Claims I and III will be dismissed with prejudice.

**B. First Amendment Retaliation**

**1. Retaliation, First Removal (Claim II)**

In Claim II, Plaintiffs allege Defendants retaliated against Plaintiffs for asserting their constitutional right to privacy and expressing concerns about Van Handel's non-compliance with pandemic safety procedures. SAC ¶45. Plaintiffs allege Defendants concealed a less-restrictive Voluntary Placement Agreement ("VPA") option, falsified accusations to a judge, removed R.K., and sent Plaintiffs a letter summarizing the falsified accusations—all in retaliation for Plaintiffs engaging in constitutionally protected activity. SAC ¶45; Doc. 66 at 12.

Defendants' concealment of the VPA option is a non-cognizable injury because the decision not to offer a VPA is absolutely privileged.[3] Thus, the Court will only examine the falsified accusations, the removal, and the threatening letter for retaliative motive.

To state a First Amendment retaliation claim, Plaintiffs must allege that "(1) [they]

---

[3] Plaintiffs allege the facts here supported implementation of a VPA instead of removal and that Defendants "concealed" this option from Plaintiffs in retaliation. SAC ¶¶ 28, 29, 44, & 45; Doc. 66 at 12. A VPA allows DCS, with parent or guardian consent, to offer services without initiating dependency proceedings. *See* Ariz. Rev. Stats. § 8-806. But because social workers have absolute immunity to make "discretionary, quasi-prosecutorial decisions to institute court dependency proceedings," *Miller v. Gammie*, 335 F.3d 889, 898 (9th Cir. 2003) (en banc), this absolute immunity includes the decision to initiate a dependency instead of offering a VPA. Incidentally, the Court also cannot discern how a *concealment* might function to chill speech when a plaintiff presumably must have some awareness of the defendant's conduct for it to have a chilling effect.

- 10 -

engaged in constitutionally protected activity; (2) the defendant's actions would 'chill a person of ordinary firmness' from continuing to engage in the protected activity; and (3) the protected activity was a substantial or motivating factor in the defendant's conduct—i.e., that there was a nexus between the defendant's actions and an intent to chill speech." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016). "Specifically, a plaintiff must show that the defendant's retaliatory animus was a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1053 (9th Cir. 2019) (internal quotations omitted).

Plaintiffs engaged in constitutionally protected speech by refusing entry to their home and expressing concern about pandemic safety. Thus, the Court will focus its analysis on Defendants' conduct with respect to the second and third elements of a retaliation claim.

### a. Falsified Allegations

Plaintiffs allege Defendants submitted false information about them to a judge in retaliation for engaging in protected activity. False information about Plaintiffs included: (1) that Plaintiffs refused to allow Defendants to see R.K., (2) that Valorie was aggressive toward Defendant Van Handel, and (3) that "the family" refused to cooperate. SAC ¶ 29.

Taking Plaintiffs' facts as true, an ordinary person would be chilled if they knew DCS submitted false information about them in a dependency petition to a judge. However, Plaintiffs do not state when they became aware of the falsified information—whether it was immediately, or in preparation for this suit. Defendants' actions must be known by Plaintiffs to have any chilling effect. "Because direct evidence of retaliatory intent rarely can be pleaded in a complaint, allegation of a chronology of events from which retaliation can be inferred is sufficient to survive dismissal." *Capp*, 940 F.3d at 1055. Plaintiffs provide no chronology for when and how they learned about the falsified allegations in the removal application. Plaintiffs accordingly failed to adequately plead the nexus between their protected activity and the misrepresentations Defendants submitted to the juvenile court judge.

### b. Removing R.K.

It is not clear whether removing a child—with whom there is no legal or biological relationship—from one's care would chill an ordinary person from continuing to engage in protected speech. But, regardless, Plaintiffs again do not adequately plead the nexus requirement—that R.K.'s removal would not have happened absent a retaliatory motive. On the contrary, substantial facts support that the removal would have occurred regardless of Plaintiffs' constitutionally protected activity.

Plaintiffs summoned the police to respond to a domestic disturbance, which had occurred between Plaintiffs' son Matthew and R.K.'s mother Amanda, in a room shared with R.K. SAC ¶¶ 20–21. Matthew Kitaj threatened suicide and was ultimately arrested and charged with assault. SAC ¶ 21. Domestic violence committed in the presence of a minor can trigger a child welfare investigation based on an allegation of criminal conduct. *See* Ariz. Rev. Stats. §§ 8-201(8)(f); 13-3601(N); and 13-3623(B). "A child welfare investigator who is responding to or investigating a report containing a criminal conduct allegation shall have the primary responsibility for making the decision whether to take a child into temporary custody." Ariz. Rev. Stats. § 8-471(E)(5).

During the investigatory visit on October 5, 2020, Defendant Van Handel learned that Matthew Kitaj was still residing in the home and actively dealing with "mental health/substance abuse issues." SAC ¶ 28. According to the Temporary Custody Notice, removal was based on the following:

(1) the caregiver is unable or unwilling to perform essential parental responsibilities and there is no other appropriate caregiver immediately available;
(2) the caregiver has not, will not, or cannot protect the child from serious or severe harm, including harm from other persons having access to the child; and
(3) criminal activity by the caregiver or criminal activity of other persons living in or having access to the home will likely result in severe harm to the child.

SAC ¶ 33. Plaintiffs allege these reasons "tracked the falsehoods in the [removal] application." SAC ¶ 33. But these reasons also track the troubling facts provided by

Plaintiffs, which the Court construes as true at this stage: all caregivers appeared willing to let Matthew Kitaj remain in the home and reside with R.K. despite Matthew's ongoing criminal, mental health, and substance abuse issues.

Plaintiffs cannot show the juvenile court would not have issued the removal order absent retaliatory intent because the facts, as stated by Plaintiffs, were more than sufficient to support probable cause for R.K.'s removal. And while "the mere existence of a legitimate motive … is insufficient to mandate dismissal," an allegation cannot be plausible "where there is an 'obvious alternative explanation' for the alleged misconduct." *Capp*, 940 F.3d at 1056 (quoting *Iqbal*, 556 U.S. at 682). The Court views Matthew Kitaj's continued presence in the home as an obvious alternative explanation for the removal that is "so convincing" as to render Plaintiffs' explanation of retaliatory motive "*im*plausible." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

### c.  October 8 Letter

Plaintiffs allege Defendants sent a letter on October 8, 2020, denying placement based on "concerns" that Plaintiffs were "impeding the investigation and not allowing access to [their] home" and not being "aligned" with DCS. SAC ¶ 34. This letter of denial appears to be in answer to Plaintiffs "seeking placement of the child with them" and providing information why DCS denied the request. An informative letter, sent in response to a request, would not be chilling to an ordinary person. Further, the fact that the letter was responding to a request by Plaintiffs further undercuts the nexus requirement.

In total, Plaintiffs fail to state a First Amendment retaliation claim related to the first removal, and the Court declines to reach Defendants' qualified immunity argument. Though the falsified allegations portion of the claim appears of dubious merit, it is possible the identified deficiencies could be cured. But no amendment could cure the deficiencies related to the VPA, removal of R.K., or the October 8 letter. Thus, the Court will dismiss Claim II without prejudice as to the retaliatory falsified allegations and with prejudice as to the other alleged retaliatory actions.

///

**2. Retaliation, Second Removal (Claim IV)**

In Claim IV, Plaintiffs allege Defendants retaliated against Plaintiffs due to Plaintiffs' "earlier expression, on October 5, 2020," for filing a complaint with the DCS Ombudsman, for Valorie Kitaj criticizing Defendants on a podcast, and for Plaintiffs denying Defendants entry without a warrant for the second removal. SAC ¶¶ 56, 85; Doc. 66 at 14. Plaintiffs allege that, in retaliation, Defendants (1) publicized false claims that Plaintiffs were "mentally unstable and dangerous," (2) attempted to convince a third party to file a DCS complaint against Plaintiffs, (3) falsified allegations to a judge in the second removal application, (4) entered and searched their home, (5) refused to allow visitation with R.K., and (6) commenced the process of substantiating charges of neglect against Valorie Kitaj[4] and placing her on the DCS central registry. SAC ¶¶ 85–86, 88.

**a. Plaintiffs State a Retaliation Claim.**

Again, to state a claim for retaliation, a plaintiff must engage in constitutionally protected activity, the defendant must commit a chilling action, and there must be a nexus between the defendant's action and the intent to chill plaintiff's speech. *Ariz. Students' Ass'n*, 824 F.3d at 867.

First, Plaintiffs' actions—filing the ombudsman complaint, criticizing DCS on a podcast, and denying a warrantless entry to their home—are all constitutionally protected activities.

Second, an ordinary person likely would be chilled if DCS (1) submitted false information about them to a judge to gain entry to their home; (2) entered and searched their home; (3) substantiated charges of neglect that resulted in their name being placed on the DCS central registry. Plaintiffs have sufficiently pleaded the second element with respect to these specific facts.

As for the third element of retaliation, Plaintiffs have sufficiently pleaded a nexus between their constitutionally protected activities and Defendants' retaliatory actions identified above. Plaintiffs provide a chronology of events that shows DCS was aware of

---

[4] Interestingly, DCS only commenced this process against Valorie even though, presumably, Paul Kitaj also owned and maintained the home DCS deemed unsafe.

- 14 -

Plaintiffs' protected activity before taking the alleged retaliatory actions.

Other facts asserted by Plaintiffs either fall short of the standard for a chilling action or fail on the nexus requirement. First, Defendants allegedly publicized false claims that Plaintiffs were "mentally unstable and dangerous," but Plaintiffs provide no information on when or how Plaintiffs discovered this fact. SAC ¶ 83. It is unclear from the pleadings whether Defendants intended for Plaintiffs to find out about and be chilled by this action, or if Defendants merely spoke poorly about Plaintiffs to a third party. The latter is simple unprofessionalism, while the former could be retaliation. Retaliatory intent cannot be inferred from these facts as pleaded. Second, Defendants *attempted* to pressure R.K.'s maternal great-grandmother, Ms. Hall, to report Plaintiffs to the DCS hotline. *See* SAC ¶¶ 58–59, 72–73, 83. But Ms. Hall ultimately decided not to report Plaintiffs. SAC ¶ 73. Not only would *not being reported to DCS* fail to chill an ordinary person, but Plaintiffs also provide no chronology showing when they became aware of this scheme to report them. Third, Plaintiffs cannot show that being denied visitation with R.K. was retaliatory because an ordinary person would not be chilled by being denied visitation with a child to whom they have no legal or biological relationship.

Consistent with the foregoing, Plaintiffs have stated a claim that Defendants acted against Plaintiffs with retaliatory intent by reporting false information about Plaintiffs to a judge, wrongfully entering and searching their home, and commencing the process of substantiating charges of neglect against Plaintiff Valorie Kitaj, which resulted in her name being added to the DCS central registry.

After the plaintiffs meet the elements for a retaliation claim, the burden shifts to the state defendants to show that they "would have taken the same action even in the absence of the protected conduct." *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016). Defendants point to the existence of a restraining order and the fact that "the home was not safe and cluttered" as the "obvious alternative explanation[s]" for the alleged retaliatory conduct. Doc. 59 at 18. However, these alternative explanations do not appear to the Court so "obvious" as to rebut Plaintiffs' allegations of retaliatory intent. Defendants have not met

their burden of rebuttal.

### b. Defenses: Scope of Amendment, Time Bar, and Plausibility

Defendants argue Claim IV is beyond the scope of amendment and, relatedly, time barred. Doc. 59 at 20–21. In the First Amended Complaint ("FAC"), Plaintiff alleged a claim for First Amendment Retaliation, including "actions taken by Defendants, as alleged in ¶¶ 27–41." Doc. 13 at 14. Paragraphs 27 through 41 list several potentially retaliatory actions by Defendants that occurred after the first removal, including that Defendants "commenced the process … of substantiating charges of neglect against only Valorie Kitaj" and, due to the substantiated charges, DCS "thereafter listed Valorie Kitaj on the 'central registry' of offenders." *Id.* at 10–11. The Court found this claim for First Amendment Retaliation deficient to the extent it relied on conclusory allegations, Doc. 44 at 13, and dismissed this claim with 30 days leave to amend. *Id.* at 16.

Claim IV in the SAC is not a new claim and, accordingly, it is not time barred. As Plaintiff argues, the allegation that Plaintiff Valorie Kitaj's name was placed on the DCS central registry appears in the FAC at ¶ 41. The SAC adds details to this First Amendment Retaliation claim to cure the deficiencies identified by the Court. But the claim itself is included in the FAC. *Compare* FAC at ¶¶ 41, 62–65 *with* SAC at ¶¶ 81–95. Accordingly, Claim IV is not beyond the scope of amendment, and neither is it time barred.

Defendants also argue Plaintiffs fail to plausibly allege Claim IV—specifically, the retaliatory act of placing Valorie's name on the DCS central registry—against any individual named defendants. Doc. 59 at 21–22. Instead, Defendants argue, it was a nonparty employee who placed Valorie's name on the central registry. *Id.* at 22. A state actor may be "an integral participant" in violating a plaintiff's constitutional rights "if (1) the defendant knew about and acquiesced in the constitutionally defective conduct as part of a common plan with those whose conduct constituted the violation, or (2) the defendant set in motion a series of acts by others which the defendant knew or reasonably should have known would cause others to inflict the constitutional injury." *Peck v. Montoya*, 51 F.4th 877, 891 (9th Cir. 2022). Certainly, the act of placing Plaintiff Valorie Kitaj's name

on the central registry could not have occurred without the events "set in motion" by Defendants. Plaintiffs' claim is plausibly alleged against the named Defendants on this point.

### c. Qualified Immunity

Defendants assert qualified immunity from Plaintiffs' claims. Doc. 59 at 8. Defendants argue that Plaintiffs "do not have a constitutionally protected liberty interest" in their relationship with R.K. and, accordingly, no reasonable case worker engaging in the alleged retaliatory conduct could expect to risk "violating any clearly established constitutional right as to a non-parent and non-guardian." *Id.* at 14–15.

Qualified immunity attaches unless a constitutional right (1) was violated and (2) was "clearly established" at the time. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). As addressed above, Plaintiffs state a claim that Defendants violated their rights under the First Amendment. Thus, this analysis will turn on the "clearly established" prong.

Defendants cite *Capp*—a case with many factual similarities to this matter—to refute any assertion of clearly established law. Doc. 59 at 13–14. Defendants argue *Capp* is distinguishable from the operative facts here because it dealt with retaliation against a parent rather than retaliation against a nonparent/nonrelative. Doc. 59 at 13–14 (citing 940 F.3d at 1059). But *Capp* is precisely the kind of case that shows the law *was* clearly established.

While "'clearly established law' should not be defined at a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011), neither is it required to find "a case with materially similar factual circumstances or even facts closely analogous to plaintiff's case," *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1038 (9th Cir. 2018). Instead, the contours of the *right* must be "sufficiently clear such that 'any reasonable official in [his] shoes would have understood that he was violating it.'" *Capp*, 940 F.3d at 1058 (alteration in original) (quoting *Reese*, 888 F.3d at 1038–39). There can be no dispute that the *right* to be free from retaliation under the First Amendment has been clearly established: "a government actor [cannot] take action that would be expected to chill protected speech out

of retaliatory animus for such speech." *Id.* at 1059.

A reasonable DCS official would have known that submitting false information to a judge, wrongfully entering and searching a home, substantiating charges of neglect, and commencing the process of placing someone's name on the central registry of offenders—when the official would not have taken these steps absent retaliatory intent—violates the First Amendment. Because Plaintiffs have alleged that retaliatory animus was the but-for cause of Defendants' conduct, Defendants are not entitled to qualified immunity at this juncture.

Defendants' motion to dismiss will be denied with respect to Claim IV, consistent with the above.

### C. Sanctions

Under Rule 11(b), sanctions may be appropriate for unsupportable, frivolous arguments. There is no evidence Plaintiffs' claims were brought in bad faith and the Court will deny Defendants' request for an opportunity to be heard on sanctions.

### IV. Order

**IT IS ORDERED GRANTING IN PART AND DENYING IN PART** Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint, consistent with the above (Doc. 59).

**IT IS FURTHER ORDERED** Claims I and III of Plaintiffs' Second Amended Complaint are **dismissed with prejudice**.

**IT IS FURTHER ORDERED** Claim II of Plaintiffs' Second Amended Complaint is **dismissed without prejudice**.

**IT IS FURTHER ORDERED DENYING** Defendants' Request for Sanctions.

Dated this 30th day of August, 2024.

John C. Hinderaker
United States District Judge