Michael Garth Moore (023742)
6336 North Oracle Road, Suite 326, #119
Tucson, Arizona 85704
Telephone: 520-437-9440
Email: mike@mgmoorelaw.com

*Trial Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Paul Kitaj, et al., | Case No. 4:22-cv-00463-JCH |
| Plaintiffs, | |
| vs. | **THIRD AMENDED COMPLAINT AND JURY DEMAND** |
| Tammy Van Handel, et al., | |
| Defendants | |

For their complaint against Defendants, in accordance with this Court's Case Management Order of November 20, 2024, Doc. 91, Plaintiffs allege as follows:

## I.  PARTIES AND JURISDICTION

1.     At all times pertinent hereto, Defendant Tammy Van Handel was a Safety Specialist investigator employed by Arizona Department of Child Safety [hereafter, "AZDCS"]. At all times pertinent hereto Kimberly Hartwell was a Safety Specialist also employed by AZDCS and was acting as an On-Going Case Manager. They are sued in their individual capacities. The actions alleged herein were done with malice,

oppression and reckless disregard of the protections afforded the Plaintiffs under the Constitution of the United States;

2.    At all times pertinent hereto, Kimberly Body and Katelyn Galvin were Supervisors employed by AZDCS, who engaged in, approved and ratified the actions of Van Handel and Hartwell.

3.    At all times pertinent hereto, Plaintiffs were husband and wife, residing in this judicial district;

4.    This case is brought to vindicate rights of the Plaintiffs secured by the First, and Fourteenth Amendments to the Constitution of the United States through 42 U.S.C. §1983;

5.    This Court has jurisdiction of this case pursuant to federal question jurisdiction, 28 U.S.C. §1331;

6.    Venue is proper in this Court pursuant to 28 U.S.C. §1391;

## II.  OPERATIVE FACTS

7.    On October 1, 2020, Plaintiffs' son, Matthew Kitaj, and his partner, Amanda Hall-Neighbors, were residing in Plaintiffs' home. Also, in the home was R.K., the one (1) year old child who Plaintiffs, Matthew and Amanda believed was a natural son of the two.

8.    Matthew and Amanda had begun a relationship approximately nine (9) years prior to the events leading up to this case. Amanda was mother to a child, A.S. Beginning in 2012, Amanda and her child resided with Plaintiffs and Matthew, who

provided shelter, financial assistance, and psychological and emotional support to both. In 2016, Amanda and A.S. moved away;

9.      Amanda returned full-time to the home of her paternal grandfather and then, maternal grandmother, JoAnn Hall, in Phoenix. She and Matthew separated. In 2018, Amanda and Matthew re-commenced their relationship. Amanda continued to live with Mrs. Hall;

10.     Towards the end of January 2019, Valorie Kitaj received a call from Amanda, who reported her situation as desperate, that she was pregnant with Matthew's child, and that she was actively using drugs. She begged Plaintiffs to take her in. Valorie immediately drove to Phoenix, collected Amanda, returned her to Tucson and placed her in a drug rehabilitation center.

11.     Thereafter, during the pregnancy, following her release from rehab, Amanda lived with Plaintiffs and Matthew in Plaintiffs' home. Valorie, a registered nurse, cared full-time for Amanda, including overseeing her medications, taking her to health care provider appointments, and overseeing her intake of food and drink. Plaintiffs were the sole sources of financial, emotional and physical support to the mother-to-be;

12.     R.K. was born on September 18, 2019. His birth certificate bore the Plaintiffs' last name.

13.     The child was born addicted to methadone and was placed in pediatric intensive care;

3

14.     Valorie Kitaj was with the child as constantly as hospital policy allowed, and also was in constant attendance to the mother;

15.     The mother and child progressed, and upon release from the hospital, came to live with Plaintiffs. Thereafter, Plaintiffs, particularly Valorie, constantly tended to the health care for mother and child;

16.     Over the next year, Plaintiffs continued to provide the child with emotional, physical and psychological support. They were the sole source of financial support for the child. Valorie, particularly, took on the preponderance of responsibilities for caring for the child, because of Amanda's limitations. Valorie also took over the education and entertainment of R.K. and generally addressed decisions regarding discipline. Over the next year, the child and Plaintiffs developed a strong bond of love and protection.

17.     On or about September 22, 2019, a DCS investigator, Yaya Perez, visited Plaintiffs' home. Perez viewed the home, interviewed Amanda and Matthew, and spoke with Paul Kitaj. She made no recommendations of any specific programs or services necessary for the department to approve the placement. She was made aware that Valorie Kitaj was an experienced registered nurse. Perez approved the placement;

18.     At just past midnight on October 1, 2020, Plaintiffs awoke to hearing raised voices in the room occupied by Matthew, Amanda and R.K., and responded. Such a disturbance was the first of its kind since R.K. had been living with them. Matthew had

always displayed care and concern for his son. Paul Kitaj called 911 because Matthew was threatening suicide;

19.    Deputies of the Pima County Sheriff's Department were dispatched, entered the home, escorted Matthew out, and ultimately arrested him on misdemeanor assault charges. Amanda suffered no injuries but had several very small marks on her neck. She denied that Matthew had attempted to choke her and denied that she had lost consciousness or had verged on losing consciousness. R.K. had no injuries, nor was there any allegation that he had attempted to harm R.K.;

20.    The deputies did not report finding any illegal drugs or alcohol in the home, nor report any impending danger to R.K. The deputies' report pictured Plaintiffs as reasonable, concerned grandparents;

21.    On information and belief, at some point following the events, one of the deputies who had been present on October 1st called the AZDCS "Hotline" and made a report;

22.    On the morning of October 2nd, Body was forwarded the Hotline narrative and assigned Defendant Van Handel to investigate. Van Handel conducted a pre-commencement review of the department records, finding only a single involvement with the department in the past, that being the home visit by DCS's Yaya Perez on September 22, 2019, who had approved the home and Plaintiffs as caregivers for R.K. Defendants also obtained the information from PCSD as to the events of the night of October 1st;

23.     Van Handel went to the Plaintiffs' home, no one was home, and Van Handel left her card, but no other information. Van Handel did not request that anyone contact her;

24.     On October 5, 2020, at approximately 10:00 a.m., Van Handel arrived for a second time at the home. Plaintiffs responded to the door. So did R.K.'s mother, Amanda. All were cooperative, answering Defendant's questions for approximately forty (40) minutes. Defendant was also informed that Plaintiffs were in the process of securing residential treatment for their son. Van Handel then demanded entry into the home, stating that the deputies had reported that the home was "cluttered", and she had concern for the baby's welfare. Plaintiffs declined to allow Defendants into the home, because of concerns about possible transmission of COVID, because Van Handel was not masked at the height of the pandemic, and because of voiced concerns about constitutional rights, but brought R.K. to the door. Valorie Kitaj informed Defendants that she did not know them, and that the family had a constitutional right to privacy. R.K. was healthy, happy and a well-adjusted infant, and this was obvious to the Defendants. Defendants, from their vantage point, could see into the house, and its condition. Defendants had no reasonable suspicion that R.K. had been abused or neglected.

25.     Van Handel's attitude became hostile to Plaintiffs and appeared angry that she had been denied entry. Van Handel, at the conclusion, told Amanda and Plaintiffs

6

that if they did not allow her into the house, she would be back later and that they would have to let her in. Plaintiffs took this as a threat. Defendant left the home;

26.    Van Handel then communicated with Body and Van Handel dictated to Body the allegations in support of a Court Authorized Removal Order [hereafter, a "CAR"] for the child. Body prepared and executed a sworn application for the CAR around 4:40 p.m. The application contained material misrepresentations and omitted exculpatory evidence. The following misrepresentations, among others, were made in the sworn Application: (1) the allegation that Plaintiffs had refused to allow Defendants to see R.K.; (2) that Mrs. Kitaj had been "aggressive" with Van Handel; (3) that "the family" refused to cooperate; (4) that the mother had refused services in September 2019. Defendants omitted the exculpatory facts (1) that Van Handel had had full opportunity to observe and examine the child; (2) that the child was known to be healthy and happy; (3) that Valorie Kitaj had assumed the responsibilities of the primary caregiver of R.K. and that there was no evidence that Plaintiffs' home environment presented any danger to the child; (4) that the department had previously investigated and approved placement; (5) that the family was addressing their son's use of illegal substances; and (6) that the facts supported the least restrictive option of implementation of a VPA;

27.    The CAR was signed by a magistrate, and Van Handel contacted the Pima County Sheriff's Department to accompany her back to the home to seize R.K.;

7

28.     At approximately 6:30 p.m., after falsely informing PCSD that Plaintiffs would not let her see the child, that the Plaintiffs were "not cooperating," and that the grandmother, Valorie Kitaj, was being "aggressive," all consistent with misrepresentations in the application, Van Handel returned to the home in the company of two PCSD deputies;

29.     Defendant Van Handel had prepared a "Temporary Custody Notice" which justified the seizure on false grounds, which tracked the falsehoods in the application, i.e., that (1) "[t]he caregiver is unable or unwilling to perform essential parental responsibilities and there is no other appropriate caregiver immediately available; (2) that "[t]he caregiver has not, will not, or cannot protect the child from serious or severe harm, including harm from other persons having access to the child; and (3), "[c]riminal activity by the caregiver or criminal activity of other persons living in or having access to the home will likely result in severe harm to the child";

30.     When Van Handel reappeared at the Kitaj home in the company of Deputies, Plaintiffs objected further to her declared intent to remove the child. Van Handel then, asserting the authority of the CAR, seized and removed R.K.;

31.     The materials prepared by Defendant Van Handel, and submitted to the Assistant Arizona Attorney General [hereafter, "AZAG"] intended to secure the filing of the petition, and to ratify the removal and separation of R.K. from the Plaintiffs' home, repeated the material misrepresentations set out in the Application, and also the omission of material exculpatory facts;

8

32.     Subsequent to the removal and commencement of the dependency, Matthew submitted to a DNA test which established that he was not the biological father of R.K.;

33.     Following a second seizure of the child, on February 25, 2021, a second dependency case was commenced;

34.     Upon removal of the child from Plaintiffs' home by Van Handel on October 5, 2020, Defendant Kimberly Hartwell was assigned as On-Going Case Manager;

35.     Hartwell placed R.K. in the physical custody of Amanda's maternal grandmother, JoAnne Hall. Amanda was allowed to reside with R.K. in Hall's home;

36.     On or around November 8, 2020, Plaintiffs formalized their complaints about the actions of Defendants in removing the child and keeping him separated from them in a communication with the AZDCS Ombudsman. Plaintiffs, through Valorie Kitaj's email, asserted that denial of access to the home was grounded on their constitutional rights, and asserted that Van Handel's stated reason for removing the child was that the Plaintiffs' home was "cluttered" complained about Van Handel's behavior in removing the child, and her subsequent disparaging comments made about Mrs. Kitaj. Defendants were notified of the Kitaj's complaint, and rejected the Plaintiffs' concerns, which was passed on to Plaintiffs by the Ombudsman on November 11, 2020;

37.     On November 20, 2020, Valerie Kitaj was invited to participate in a podcast hosted by one Cynthia Becker, titled: "The Reality Series: CPS The Horror Stories;

38.    Mrs. Kitaj did appear under her own name;

39.    During the podcast, Mrs. Kitaj related (1) the history of the family with the child; (2) described the events of October 5th; (3) spoke of incompetence of the department; (4) related Hartwell's sharing her communication to the Ombudsman with Amanda, which she described as "wildly inappropriate"; (5) described the case workers as ordering Amanda to cease communications with Plaintiffs; (6) voiced, after discussion, that "nobody holds them [AZDCS agents] accountable"; and (7) concluded with the advice to listeners, "Don't ever talk to Social Services, do not talk to CPS without an attorney present, just don't do it, nothing good can come of it….";

40.    An accurate copy of the podcast transcript is appended as Appendix A;

41.    Unknown to Plaintiffs, Hartwell had begun communicating via email and voice communications with the maternal grandmother, JoAnn Hall, and had begun falsely reporting to Hall that Plaintiffs were mentally unstable, and, particularly that Valorie Kitaj was unstable and that both Plaintiffs could not be trusted around the child because they presented a danger to him;

42.    Hartwell, further falsely informed Mrs. Hall that the Plaintiffs were restricted to supervised visitation with the child, and, so believing, Mrs. Hall denied Plaintiffs the opportunity to visit in her home;

43.    These communications, and those identified below, resulted from conferences between Hartwell and Van Handel and were intended by them to be

communicated to the Plaintiffs and to intimidate the Plaintiffs from continuing to engage in protected expression;

44.     Hartwell, undertook social media searches related to Plaintiffs;

45.     Between November 20th and December 4th of 2020, Hartwell downloaded a copy of the podcast broadcast. She also downloaded two reports, one from 2018, the other, April 2020, from an outlet, KJZZ, reporting on scabies outbreaks at two Arizona prisons that Mrs. Kitaj had brought to light after visiting her son, who had been incarcerated in 2018;

46.     On December 4th, after conferring with Van Handel, Hartwell emailed both media files to Mrs. Hall and Amanda – with the explanation that the podcast was the two women "expressing how they were wronged by CPD/DCS" and that "you guys should be aware of what is out there" and told the two that she had notified the Arizona Attorney General. In further exchange, she wrote "I was pretty shocked by it as well.";

47.     Following the disclosure of the media files, Hartwell continued to falsely report to Hall, who believed her, that Plaintiffs were mentally unstable;

48.     On or about January 8, 2021, the first dependency was dismissed;

49.     On January 12, 2021, Hall emailed Hartwell that Valorie and Paul had requested the opportunity to visit R.K. She reported she was open to that. Hartwell emailed back stating, among other things, that "I can't tell you what to do but you know that you don't have to let them see [R.K.]. I would be very careful about letting them see [R.K.], especially in your home, because you don't know what they are capable of….

Valorie's mental health is not healthy (sic) and you never know what she might do?" It was not until July and August 2021 that Plaintiffs learned of these lies;

50.     Between January 8 and the end of January, Plaintiffs, with the knowledge of Mrs. Hall, visited with Amanda and the child, and transported them to Tucson for overnight visits. On or about February 2, 2021, Amanda called Valorie and asked if Plaintiffs could come and get her, stating, "I want to come home";

51.     Plaintiffs immediately drove to Gilbert, met with Amanda and R.K. and drove them home to Tucson;

52.     The family immediately returned to the close association that had existed before the first removal. Valorie took over the primary caregiver's responsibilities, and Plaintiffs supported R.K. and Amanda financially, physically, and emotionally;

53.     Hartwell, upon learning that Amanda had returned to Tucson with R.K., and having spoken with Van Handel, although without any basis, sought a means of having the case reopened and separating the mother and child from the Kitajs;

54.     To that end, on February 22, 2021, Van Handel herself placed a call to the Hotline, during which she falsely claimed that Mrs. Kitaj was "known to be violent" and "assaulted DCS investigator in front of law enforcement." Van Handel also falsely reported that Amanda had secured an order of protection against Matthew and the Plaintiffs themselves;

55.     The Hotline specialist, however, determined the allegations did not support a charge of abuse or neglect and declined to assign it for investigation;

56.    Hartwell, with Van Handel's urging, then began pressuring the grandmother to call the AZDCS Hotline to report alleged abuse and neglect of the child. She continued to urge Mrs. Hall that the Kitajs were mentally unstable and a danger to the child. The grandmother resisted these demands, but, on February 24, 2021, placed a call to the Hotline as the Defendants had pressured her;

57.    During the call, Mrs. Hall, who first indicated the mental instability of the Kitaj's, repudiated that statement to the Hotline call taker, and informed him she had no grounds to report abuse or neglect. The Hotline call taker directed the grandmother to call local law enforcement and request a welfare check. The grandmother, on hanging up, decided not to place that call, and called Hartwell, informing the Defendant that she, Mrs. Hall, did not want the matter pursued any further;

58.    During this time, Defendants communicated with Matthew's probation officer, one Mike Ramirez, asking him to conduct a visit to the home, and secure evidence to support the charge of abuse or neglect;

59.    Ramirez agreed, and on February 24th, conducted the home visit. Upon concluding it, he informed Defendants that he would put in a call to the Hotline, which he did. Ramirez falsely reported that the conduct of the home was hazardous to the child;

60.    Both the Hall report and Ramirez's report were assigned intake numbers and forwarded to Van Handel's office for investigation. Body assigned Van Handel to

conduct the investigation, though Body understood that Van Handel was hostile to

Plaintiffs, and had never been assaulted by either Plaintiff;

.    61.    At about 8:00 a.m. on February 25, 2021, Defendant Van Handel appeared

at Plaintiffs' door, accompanied by three uniformed, armed Pima County Sheriff's

Deputies.

62.    Determined to remove the child without legal justification, before she met

with the Deputies to go to the home, she prepared a Temporary Custody Notice ["TCN"]

to give legal grounds. Van Handel, listed the following grounds for removal:

> The caregiver is unable to perform essential parental responsibilities due to
> substance use, mental illness, physical impairment, cognitive limitations.

> The caregiver's behavior is violent, bizarre, erratic, unpredictable,
> incoherent, or totally inappropriate and is a threat to child safety.

> Physical conditions in the home are hazardous and immediately threaten the
> child's safety.

63.    Van Handel marked the need for removal as "Exigent Circumstances,"

meaning she was empowered to remove the child because the child was in imminent

danger of physical or sexual abuse in the time it would take the investigator to secure a

CAR. Van Handel shared with the deputies these false allegations to secure their

assistance in removing the child;

64.    There were no exigent circumstances;

65.    The "caregiver" identified in Van Handel's TCN were both Valorie Kitaj

and Paul Kitaj;

14

66.     At the door of the home, a deputy and Van Handel informed Plaintiffs that Van Handel was there to remove the child. When asked to produce a warrant, Van Handel handed the TCN to a deputy, who gave it to Amanda, who showed it to Paul and Valorie;

67.     Both Plaintiffs were stunned by reading the false, outrageous allegations included by Van Handel;

68.     Plaintiffs informed Van Handel that they were not permitted to enter without a court order. Mrs. Kitaj called Van Handel a liar.

69.     The deputies and Van Handel walked to the sidewalk, and spent about twenty (20) minutes outside the hearing of Plaintiffs;

70.     When the four returned, Van Handel informed Plaintiffs that she had a court order for the seizure of R.K. on the grounds, she stated, because the home was not reasonably safe to protect the child from the risk of injury or illness, and because a "restraining order" had been issued against Plaintiffs' having any contact with the mother and child. Van Handel also stated that she was present as a result of a call placed by Mrs. Hall. At that point, Van Handel had not entered the premises.

71.     When hearing Van Handel allege in the presence of law enforcement that Amanda had an outstanding protective order against them, Plaintiffs were surprised and angered and informed Van Handel and the Deputies that there was no such order against them. Amanda, who was present, was not asked by Van Handel if she was at the Kitaj's

home, or in the company of Matthew, by her own consent. However, Amanda stated that if an order existed, she would get it dismissed;

72.    One false allegation, among others, made by Van Handel with the collaboration of Hartwell stated that

> On or about February 25, 2021, Valorie Kitaj neglected [R.K.], age 1, when she failed to provide shelter as she allowed the child to reside in a home containing spoiled food, cleaning products, piles of clothing and other items within reach of the child, placing the child as unreasonable risk of harm for injury and illness.

73.    After Paul Kitaj was shown the CAR, Van Handel entered the home, and she and the deputies walked through, and into, all the rooms. The home environment was obviously safe. Despite knowing that the allegations she had sworn to in the application for the CAR did not exist, and that no "restraining order" had been issued against Plaintiffs, Van Handel removed the child, who was subsequently placed in foster care. Plaintiffs' contact with the child was barred by Defendants;

## III. FOURTH CLAIM: CLAIM AGAINST VAN HANDEL AND HARTWELL: FIRST AMENDMENT RETALIATION IN SECOND REMOVAL AND PLACEMENT OF VALORIE KITAJ'S NAME ON THE DEPARTMENT "CENTRAL REGISTRY" OF OFFENDERS

74.    Plaintiffs reallege the foregoing Paragraphs as if fully set forth herein;

75.    The Kitaj's Ombudsman complaint of November 8, 2020, and Mrs. Kitaj's statements broadcast on November 20, 2020, constituted expression protected under the First and Fourteenth Amendments;

76.    Defendants' actions, in (1) publicizing the false claims that both Plaintiffs were mentally unstable and dangerous to the child; (2) in pressuring Joann Hall to report

Plaintiffs to the DCS Hotline in order to commence a second investigation and seize the child, were acted and done in retaliation for the Plaintiffs' protected expression, and were intended to chill expression;

77.     During the encounter at the home on February 25th, the Plaintiffs reiterated previous expressions that Van Handel had seized the child without lawful authority in the first seizure, that she was lying about having grounds to enter the home and remove the child, that Van Handel was untruthful about the existence of an order of protection against them, and questioning the existence of the conditions Van Handel listed on the TCN. Further, Plaintiffs' demand to Van Handel that she secure a warrant in order to enter the home and seize the child, was protected expression;

78.     The falsification of grounds to enter the home and seize the child, in the TCN and application for the CAR, the entrance and search of the home both were motivated by retaliation for Plaintiffs' earlier expression, on October 5, 2020, in the Ombudsman complaint, the podcast, as well as by the Plaintiffs' denial of entry into the home in the absence of a warrant and the other protected expression on the 25th of February;

79.     Following the second removal, Defendants' refusal to allow visitation was motivated by retaliatory intent;

80.     Following the second removal, Defendants continued to engage in actions motivated by hostility to the protected expression;

81.    On March 3, 2021, Plaintiffs submitted a second Ombudsman online complaint, reiterating complaints previously made in October, and including additional concerns about falsehoods engaged in by Van Handel. Plaintiffs sought specific allegations made against them from the Ombudsman;

82.    The Ombudsman's office passed those complaints on to Van Handel, who denied them, and on March 3, 2021, having secured from Van Handel the purported facts, emailed Plaintiffs a response to their requests;

83.    The response was documented in the DCS file, and a true and accurate copy is appended hereto as Plaintiffs' Appendix D;

84.    Because by this time Van Handel had named Valorie Kitaj as a perpetrator of child neglect, Body included a Notice of Duty to Inform, which identified the violation as "Living environment is a threat to child safety";

85.    In repeating false allegations that are set out above, Van Handel added additional ones. Van Handel, through Body, alleged Mrs. Kitaj's "aggressive behavior" both in the October 2020 removal and in the latest one. She enlarged on the allegation of Amanda securing an order of protection that Mrs. Kitaj had been "aggressive to [Amanda] after R.K. was removed in October, which led [Amanda] to obtain an order of protection against you." Van Handel, through Body, falsely stated that Mrs. Kitaj had taken "R.K. away from [Amanda] and locked yourself in a room." Finally, Van Handel, through Body claimed that in the second removal Mrs. Kitaj "had to be held back by your husband and law enforcement to prevent you from assaulting Tammy."

86.    Upon learning of the content of the TCN, and upon reading Body's communication, both Plaintiffs were stunned and angered. When they learned of the false accusations of their mental instability and being a danger to children that had been communicated to Mrs. Hall, Plaintiffs were outraged and frightened that the publication of the accusations would threaten both Plaintiffs' professional standing and Paul Kitaj's employment in the national security defense industry;

87.    Unknown to Plaintiffs, Defendants, as a result of the protected expression of both Plaintiffs, identified above, commenced the process in the department of substantiating charges of neglect against only Valorie Kitaj;

88.    Defendants sought substantiation of the charge of neglect through request to the department's "Protective Services Review Team" [hereafter, "PSRT"] that the PSRT find that Valorie Kitaj had violated A.R.S. §8-201 in committing neglect against the child;

89.    Defendants knew that a finding of substantiation would result in Mrs. Kitaj's name being listed in the department "Central Registry" of offenders, and that, as a nurse, she would subsequently, for life, be denied employment by any agency or health care provider that is required by Arizona law to consult the Central Registry before hiring a nurse applicant. Such facilities, institutions and agencies constitute virtually the entirety of employers for which Mrs. Kitaj is qualified by her professional education and licensure;

90.     Relying on the fabrications documented by Defendants in the department case file, the PSRT issued a letter to Mrs. Kitaj on May 26, 2021, repeating the false allegations of neglect against her. A true and accurate copy of that document is appended as Appendix B;

91.     The letter was not received by Plaintiffs until late June, 2021;

92.     On July 13, 2021, the PSRT, again relying on the false evidence in the department record, issued its finding that the charge was substantiated, and directed that Mrs. Kitaj's name be placed on the Central Registry and so notified Plaintiffs. A true and accurate copy of that document is appended as Appendix C;

93.     The actions set out above constituted retaliation by Defendants against the Plaintiffs because they had engaged in expression of concern regarding the department's actions in the first and second seizures;

94.     Defendants' actions were intended to punish Plaintiffs for having engaged in protected expression and to sever the close and intimate relationship the Plaintiffs had developed with R.K. and these actions would chill an ordinary individual from engaging in the protected expression;

95.     As a direct and proximate result, Plaintiffs have suffered intangible damages, including humiliation, emotional distress, loss of self-esteem and will continue to suffer such injuries and losses in the future;

WHEREFORE, Plaintiffs demand judgment against these Defendants, jointly and severally, as set forth below:

1.    An award of compensatory damages to each Plaintiff in such amounts as the jury deems just;

2.    An award of punitive damages to each Plaintiff in such amounts as the jury deems just;

3.    An award of reasonable attorney fees and costs, pursuant to 42 U.S.C. §1988;

4.    An award of pre-judgment and post-judgment interest;

5.    Such other relief as this Court deems just.


Respectfully submitted,

/s/ Michael Garth Moore
Michael Garth Moore (023742)
6336 North Oracle Road, Suite 326, #119
Tucson, Arizona 85704
Telephone: 520-437-9440
mike@mgmoorelaw.com

*Trial Counsel for Plaintiffs*

21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing was filed through the Court's electronic filing system on February 24, 2025. Notice of this filing will be sent to all parties and counsel through the Court's filing system. Parties and counsel may access the filing through the Court's system.

*/s/ Michael Garth Moore*